## UNITED STATES v. BLOCK et al. *
### No. 265.

Circuit Court of Appeals, Second Circuit.

March 8, 1937.

*Writ of certiorari denied 57 S.Ct. 793, 81 L.Ed. —.

Louis Halle, of New York City, for appellants.

Lamar Hardy, U. S. Atty., of New York City (John W. Burke, Jr., and Richard Delafield, Asst. U. S. Attys., and Walter B. Lockwood, Sp. Asst. U. S. Atty., all of New York City, of counsel), for the United States.

Before L. HAND, SWAN, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

Block and Levy were convicted with others upon three counts for possessing an unlawful still, and upon another count for conspiracy to possess the still and to defraud the United States of taxes by its use. In general outline the evidence proved that the ringleaders, Griffin, Brinkman, Block and Levy, leased a parcel of land near Fishkill in Dutchess County, N. Y., on which they set up a still with the aid of workmen, among others one Rubin, who testified against them on the trial. They shipped to New York by truck potable alcohol, reclaimed by the still out of denatured alcohol. It is not necessary to discuss the evidence in detail, because Block's guilt is too plain for doubt, and, as will appear, Levy's conviction cannot stand anyway. One of the prosecution's witnesses was Daniel Block, a brother of the defendant, Max Block. Before the trial he had been subpœnaed to appear before the grand jury or the prosecutor, to whom he made a statement which was taken down by a stenographer and typed. This incriminated both Max Block and Levy; the witness said in substance that together with Griffin they were the leaders in the enterprise, and had often discussed the still and the general business in his hearing, especially at Block's house where he lived. When called at the trial this witness proved recalcitrant and would not stand by his story. The prosecutor for a while unsuccessfully plied him in the usual way; he would remember nothing of any consequence and what he did was vague and unconvincing; it was plain to anyone who had the ex parte examination before him, that he had had a change of heart and meant to protect his brother. The prosecutor thereupon turned the examination into a cross-examination; and this the judge allowed—quite properly, for it was obvious that the witness was suppressing the truth. That also proved unsuccessful; and the prosecutor began to use the earlier statement. First, he asked the witness to read it, and see whether it did not refresh his recollection. It did not. Finding himself thus baffled, the prosecutor then began to read the examination, question and answer, asking him after he had read a passage, whether it was true. The witness, so cornered, tried to excuse himself by saying that he had been frightened; that he had answered what he thought would best please; and that all the incriminating answers were fabrications of the moment. This was continued until the whole of the statement had been read to the jury, though all that was of any moment he explicitly disclaimed. All this time the defendants continually protested and were uniformly overruled. Upon his charge the judge told the jury that they might use any part of the statement which the witness had admitted; but none that he had not.

The position of a prosecutor, faced with a perjured witness whom he has

called with good warrant to suppose him friendly, is trying, and the courts have not dealt hardly with him. In Di Carlo v. United States, 6 F.(2d) 364, we said that he should be given the greatest latitude in examination and allowed to use the earlier statement, even at the risk that the jury might take it as testimony; indeed, we went so far as to say that it was possible that it might in fact become testimony; for a witness upon the stand may so behave that his conduct is more of an affirmation of an earlier statement than his halting words are a denial; just as a nod or a gesture may be an assent. Men do not express themselves wholly by words. But the situation at bar was very different from anything of the kind. It is true that the witness was plainly lying, but that was just because, instead of affirming the statement, he persistently and unconditionally denied it. There was not the least color for allowing the jury to take it as his testimony on the stand, and the inevitable result was to get before them unsworn evidence in an exceptionally impressive and damaging way. For it was much worse that the witness was obviously trying to protect the defendants; so that when the examination was over, the natural conclusion was not only that the defendants had kept the still, but that they had suborned the witness to deny it. The judge's charge mended nothing; he left the jury to disentangle in their minds the innocuous part which the witness had conceded, from the great bulk which he had disaffirmed. The hearsay remained as effective as before, and really the prejudice was incurable anyway, whatever he might have said. Perhaps the rule against hearsay ought to be discretionary, dependent upon how far the party against whom it is used has effective protection. In a case like this for instance, there seems to be no good reason why the prosecution should be held to what it can extract from such a witness on the stand; he confronts the accused, and if he retracts, the accused gets whatever benefit that may be. In other affairs such a statement would be accepted as evidence to be weighed against the retraction, and nobody would think it an injustice to make use of it. But we are not free so to make over the law; we cannot sustain a conviction based upon unsworn evidence.

For this reason the conviction of Levy cannot stand, though there was enough other evidence to sustain a verdict against him. The most important part of it was the testimony of Rubin, a workman at the still, who was trying to save himself; and it is entirely possible that the spectacle of Daniel Block's tergiversations on the background of his original statement may have turned the scale. The same would be true as to Max Block also, except that in his case the record contains so complete an admission of guilt that no honest jury could have hesitated to convict him. Brinkman, one of the accused, had been prosecuted for a bankruptcy fraud, and on his trial for that crime the prosecution called Max Block as a witness, who was under arrest at the time. He swore that Brinkman's "sanatorium at Fishkill" was "our plant"; that "we had a still in that building"; that Brinkman was known as "Brooks," and he, Max Block, as "Brooks, Jr."; that "that alcohol business" was run in his name, his partners being Griffin, Levy and Brinkman; and that he was with Brinkman in one other venture besides. Block did not take the stand in the case at bar, and so this testimony stood, not only uncontradicted, but unexplained; unless it was improperly admitted, there was no issue for the jury. The objection is that as he had not been warned of his privilege against self-incrimination before he gave these answers, they were inadmissible in the case at bar; were not "voluntary." Even so, it is impossible to see how the judge at that trial could have apprehended that any warning was necessary, and that alone would seem to be answer enough. Moreover, although the authorities are not wholly clear as to whether a witness must be warned of his privilege in such a case, if his testimony is to be later used against him, for us the question is determined by two decisions of the Supreme Court; Wilson v. United States, 162 U.S. 613, 16 S.Ct. 895, 40 L.Ed. 1090, and Powers v. United States, 223 U.S. 303, 32 S.Ct. 281, 56 L.Ed. 448, in each of which testimony of the accused taken on preliminary examination was successfully used against him on his trial. In the first he had been taken into custody the night before, apparently to protect him from the threats of a mob. A commissioner examined him; he was not represented by counsel, or advised that he need not speak; apparently the examination was in invitum. Still the court thought the testimony voluntary. In the second case the accused voluntarily took the stand at the preliminary examination, and his statement was used against him, though he had not been advised of his privilege. Wilson v.

United States, supra, is therefore closer to the case at bar than Powers v. United States, supra, but both seem to us to support the present conviction. The question is not, and should not be subject to any fixed rule, Wigmore, § 2269; the relevant inquiry ought always to be whether the testimony was freely given, all things considered. In the case at bar the answers appear to have been unconstrained. In the form we have the testimony it is very hard to know just how it came out, but we must take it as it is. The most damaging admission was the statement that the sanatorium was "our plant" and that we kept a "still" there. That was in answer to the question whether Brinkman had a sanatorium in Fishkill, and was volunteered. The same was true of the use of the name, "Brooks, Jr." The question: "Is *that* alcohol business run in your name?" presupposes that the matter had already appeared; whether it was forced out or not we cannot tell. Certainly from the scraps we have, the witness seemed to be under no compulsion and it was not necessary to warn him of his privilege.

The only other question raised on Block's appeal is the failure of the judge to tell the jury that they should look jealously at the testimony of Rubin, as an accomplice. It is common practice so to caution a jury, but it is not necessary even when as here the accused asks that it be done. Caminetti v. United States, 242 U. S. 470, 495, 37 S.Ct. 192, 61 L.Ed. 442, L.R. A. 1917F, 502, Ann.Cas.1917B, 1168; Rachmil v. United States, 288 F. 782, 785 (C.C.A.2); Wallace v. United States, 243 F. 300, 307 (C.C.A.7); United States v. Becker (C.C.A.) 62 F.(2d) 1007, 1009.

Conviction affirmed as to Block; reversed as to Levy.